WILLIAM GREAVES, RESPONDENT, v. KANSAS CITY JUNIOR ORPHEUM ET
AL., APPELLANTS.—80 S. W. (2d) 228.

Kansas City Court of Appeals.    January 28, 1935.

*Martin, Scheufler & Carbaugh* for respondent.

*Cooper, Neel, Kemp & Sutherland* and *Frank K. Rogers* for appellants.

BLAND, J.—This is an action for damages for false arrest. There was a verdict and judgment in favor of plaintiff and against the defendants for actual damages in the sum of $750 and for punitive damages in a like sum. Defendants have appealed.

The facts show that plaintiff was a man of good reputation, residing in Kansas City and, for a number of years prior to the month of October, 1931, had been engaged as head janitor and custodian of various theaters and office buildings in Kansas City and that he was employed as such by the defendant, Kansas City Junior Orpheum Company. This company operates the Mainstreet Theater, a large theater in Kansas City, seating over 3000 persons. Plaintiff's employment with the defendant company started about the time that the theater was first opened in 1931. Between that time and October 15, 1931, plaintiff was so employed, although at intervals he worked elsewhere. He was discharged by the theater company on October 15, 1931, because his services were unsatisfactory. Defendant, Lawrence Lehman, was the general manager of the Mainstreet Theater and one Ray Marchbanks was his assistant and the treasurer of the theater.

The evidence further shows that in April, 1931, the seats on the main floor of the theater and three rows in the balcony, about 1800 in all, were removed and improvements were made in the cooling system; that the work of removing the seats was under the direction of one Sexton, employed by the Radio Keith Orpheum Company as superintendent of new construction and the remodeling of old theaters. That company is the parent company of the defendant, Kansas City Junior Orpheum Company. All of the fixed chairs were taken up and put into the crates which had contained the new chairs, being installed, and were afterwards stored in an adjacent building. However, there were 125 to 220 chairs in the boxes and loges situated to the sides of the theater. These loose chairs were referred to as bent wood chairs and were light and moveable, having cane bottoms. About 36 of the bent wood chairs were shipped to Cedar Rapids, Iowa. During the progress of the work and the removing of the chairs Sexton ordered plaintiff to remove the bent wood chairs from the loges and the boxes, select the good chairs, store them on the back stage and to place the defective chairs in the plenum chamber. All of this was done by plaintiff and his helpers or assistant janitors. The chairs were sorted in the theater. The good chairs were first placed on the back stage and thereafter carried by plaintiff and his helpers to the basement under the stage and stored in a place referred to in the evidence as the property room. The defective chairs, numbering about 50, were placed in the plenum chamber.

The plenum chamber was a part of the air conditioning system in the theater and was immediately below the lower floor of the audi-

torium. This chamber was about five feet in height at the front end of the auditorium, or that opposite to the stage, and tapered off to a height of one foot at the stage end. The conditioned air was conveyed to the plenum chamber and from there it escaped into the auditorium by means of vents in the floor of the latter. The plenum chamber had been used for a catch-all; there was stored therein a lot of "rubbish, broken sign boards and other boards, painted signs and a lot of old frames and broken things," also, "electric light bulbs, arc-lights and artists materials, old pipe and stuff like that."

A short time after the defective chairs were stored in the plenum chamber, Sexton, on account of the fire hazard, ordered plaintiff to clean out everything in the chamber and, in this connection, he stated to plaintiff: "If you want to get rid of these chairs (in the plenum chamber) and sell them and make a few dollars out of them, you are perfectly welcome to have them." Thereafter, plaintiff and the janitors under him cleaned out the plenum chamber but left the defective chairs therein. In July, 1931, desiring to sell the chairs in the plenum chamber, plaintiff called up by 'phone a secondhand man, who came to the theater and looked at them but only offered $4 for them. Plaintiff refused the offer. Later he asked one of his helpers, a colored man by the name of Lettus Williams, if the latter knew of a secondhand man who might be interested in buying some of the chairs. Thereafter, Williams found a secondhand dealer by the name of Goodman. Goodman came to see plaintiff at the theater and the latter showed him the chairs in the plenum chamber and plaintiff tiff sold him ten chairs for a total sum of sixty cents. These chairs were hauled away by Goodman, being removed from the front part of the theater about 9:30 A. M. of the day of the sale. Williams assisted in carrying these chairs out of the theater. About the first week in September, plaintiff sold twelve more chairs to Goodman for $2.50, the chairs being taken from the plenum chamber and out of the stage door at the rear of the theater and loaded by plaintiff and Williams into a truck. This took place about 11:00 A. M. A few days later plaintiff sold twelve more chairs to Goodman for $2, the chairs being ing taken out by plaintiff and Williams from the plenum chamber, between 9:30 and 11:00 o'clock A. M., and delivered to the Goodman truck at the stage door, as was done in the second sale. Part of the money received from the sale of the chairs was paid by plaintiff to Williams.

Practically everything contained in the foregoing statement of facts appears in evidence on the part of plaintiff. Defendants' evidence discloses the following:

A day or two prior to plaintiff's arrest, which was on October 20, 1931, the property man at the theater was ordered to supply 22 or

25 bent wood chairs for a band act which was booked at the theater for the following week. He went to the property room under the stage to get the chairs and found that all but a few of them were gone. Not being able to find the lost chairs the property man reported the matter to Marchbanks. Marchbanks made a thorough search of the theater, including the plenum chamber, but he could not find the lost chairs. He then reported the matter to the defendant, Lehman, who instructed him to investigate thoroughly and see if he could locate the chairs. It appears that one Sparks, an employee of a parking station opposite the stage entrance to the theater, had seen plaintiff and Williams loading the chairs into the trucks. Marchbanks talked with Sparks and reported to Lehman that he knew where a part of the chairs had been taken. Whereupon, Lehman told him to report the matter to the police, which was done. Detective Frederick, of the Kansas City Police Department, immediately came to the theater and talked with Marchbanks, who took him to see Sparks. Frederick asked Sparks what he knew about the matter and the latter told him what he had seen. Whereupon, Frederick said to Sparks: ''I will go out and get Bill Greaves'' (the plaintiff). Plaintiff was without work and was at home. Marchbanks gave Frederick his address and telephone number.

Frederick, testifying for the defendant, stated that he called up plaintiff, saying that there might be an opening for work at the Pantages Theater for him and asked him if he would be at home, that he would like to come out and see him. Plaintiff agreed to wait for him. However, plaintiff testified that he recognized the voice of the person who called him as that of Marchbanks; that the voice said: ''I think that the Pantages Theater has an opening and I believe I can get you a job as custodian.'' The party said that he wanted to come out to see him and plaintiff answered that if the person wanted to come out he would wait for him. Frederick went to the home of plaintiff and arrested him, telling him that he was being arrested for stealing the chairs. No warrant was issued for the arrest. Plaintiff denied to Frederick that he had stolen the chairs, but said that Sexton had given them to him and told Frederick of the connection that Williams and Goodman had with the transaction. On the way to the police station Frederick arrested Williams and took him and plaintiff to the station. Goodman was also arrested.

Plaintiff was arrested about 3:30 in the afternoon and was held in the police station until about 10:30 that night, when he was released on a $1000 bond, to appear the next morning. During this time a typewritten statement was taken from plaintiff, which he signed, in which he substantially admitted that he took the chairs without authority. Plaintiff testified that all that he told the police was not in

the statement and that he signed it without reading it because he did not have his glasses with him and that the statement was incorrect.

That night, after being released on bond, plaintiff, his attorney, Mr. E. H. Hammett, his niece and one John Crose, who had charge of the installation of the new chairs in the theater at the time the old ones were taken out, went to the theater for the purpose of having the charges against plaintiff dismissed, if possible. They saw Lehman in the foyer of the theater. Plaintiff's niece was ahead of the party. She approached Lehman and asked him why he had "had my uncle arrested." Lehman replied: "Well, there were chairs missing and they had to arrest someone;" that all of them then went into Lehman's private office, the niece remaining outside at Lehman's direction. The evidence further shows that plaintiff protested his innocence and Lehman pointed his finger at him and said: "Didn't you know you had stolen the chairs." Plaintiff testified that Lehman kept insisting that he had done so and Lehman said to him that plaintiff "had stolen the chairs and that is the reason that they had ordered the police to arrest me, and at that time Mr. Crose, I believe, stepped out for a few minutes. Q. Had you heard Mr. Crose say anything to Mr. Lehman? A. Mr. Crose told Mr. Lehman that he was present at the time those chairs was given to me." Mr. Hammett, plaintiff's attorney, kept insisting upon plaintiff being released and Lehman said: "He couldn't get my release; that he would have to hold me and prosecute me." Lehman wanted plaintiff to sign a release of liability for his arrest but plaintiff's attorney objected.

Hammett testified that during the conversation Lehman said to plaintiff: "Well, it is reported to me that you have stolen and sold some chairs and I have turned the matter over to the police, and if the story is true, you will be prosecuted to the limit, and the law will take its course." Hammett asked Lehman to wire Sexton to verify plaintiff's story that Sexton had given him the chairs and Lehman said: "Well, I am willing to do that; I am willing to appear tomorrow morning at your request and have these charges dropped against Mr. Greaves, providing Mr. Greaves will sign a waiver of any claim for damages against me or against the Mainstreet Theater;" that the witness objected to the plaintiff signing any such waiver and then "Mr. Lehman became infuriated toward me and raised up in his chair and said, 'Very well then, if he will not sign such a waiver of claims, I will prosecute him to the limit. Let the law take its course, and, gentlemen, the conference is at a close as far as I am concerned.' Q. Where did you go then? A. We were rushed out of the office, clear outside of the building."

Plaintiff wired Sexton about the matter but the latter took no action. Crose testified that he heard Sexton tell plaintiff to clean out

the plenum chamber and to take everything out, including the old chairs. He further testified that, "I don't know nothing about the chairs, but I know Jack (Sexton) told Billie (plaintiff) . . . to clean that stuff out of there and I carried some old opera chairs out of there and put them in the room—that is, the janitor did, and put them in the room where we had the rest of the chairs stored. He testified, however, that at the meeting had at the theater after plaintiff's arrest he told Lehman that Sexton had given plaintiff the chairs; that the chairs were broken down; that Sexton told plaintiff to dispose of them and to "get rid of them."

Sometime after plaintiff's arrest Frederick telephoned to Lehman and Marchbanks about the case and a day or two after plaintiff's arrest Frederick went to the theater and gave either Lehman or Marchbanks a copy of the statement that plaintiff had made to the police and received from Marchbanks two complimentary tickets to the theater. On the same day Marchbanks and Lehman went to police headquarters and talked with detective Thurman. Defendants sought to show the conversation between Thurman, Lehman and Marchbanks but, over the objection of the plaintiff, the court refused to permit them to do so. The day after his arrest plaintiff appeared at police headquarters and was kept in prison there until about 8:30 that night, when he was again released on bond to appear on the morning of October 26. He appeared on that day and was held there until nine o'clock A. M., when Frederick told him that he could go, that there had been no charges filed against him.

During the time that plaintiff was incarcerated he was put into a cage with people of the underworld, his finger prints taken and he was put through the "show up room." His arrest has resulted in humiliation and disgrace. There is no claim that the verdict for compensatory damages is excessive and it is unnecessary for us to relate in detail plaintiff's treatment after his arrest.

Frederick, testifying for the defendants, stated that he investigated the case and arrested plaintiff; that no one connected with the theater had given him any instructions or directions to arrest any one. Lehman testified that he did not ask the police, or any one else, to arrest plaintiff or to telephone him; that he did not know that plaintiff had been arrested or was even suspected of having taken the chairs until plaintiff and his lawyer came to the theater on the night of October 21, after plaintiff had been arrested and released on bond; that the witness' only connection with the matter was his going to police headquarters and talking with Chief Thurman about the matter. The court sustained plaintiff's objection as to what this conversation was. Lehman further testified that he made no appearance against plaintiff and that he heard sometime later that he had been discharged by the police.

Lehman further testified that, when plaintiff and his party came to the theater to see him about not prosecuting plaintiff, the latter "wanted to know what I had him arrested for and I told him I knew nothing about why he was arrested and he tried to plead with me. he was innocent in the matter and didn't want me to appear against him or prosecute him. Q. Well, what did you say? A. Told him I wanted to investigate the matter, I didn't know anything more about it than what he had told me." Lehman denied the conversation testified to by plaintiff's niece. He testified that what he told Hammett was "that I didn't know anything about the details of the matter, that the first I knew of it he had been arrested and I wanted to find out from the (police) department the next day what the situation was in regard to it. Q. Well, now, then, after that did they leave? A. Yes." He further testified that some of the chairs in the theater were being repaired during July and August, 1931; that when a chair was damaged it would be repaired immediately; that during July and August, 1931, there was not over a dozen bent wood chairs in the property room. He admitted that there was a conversation about a release at the meeting at the theater after plaintiff's arrest. However, he testified that he did not ask plaintiff to sign the release; that he did not send a telegram to Sexton but thought that he wrote a letter to Mr. Brown, one of defendant's officers in Chicago in charge of construction of the "company at Chicago," asking for Sexton's address; that he at no time wired Sexton; that he thought he wrote Sexton but did not think he received a reply from him.

Sexton, testifying for the defendants, said that about ten of the bent wood chairs had the bottoms broken out of them; that he received a wire from plaintiff asking that he send a wire to him stating that he had given him authority to take the chairs; but he did not reply because he had not given him such authority; that he received a letter from Mr. Brown about the matter; that he wrote directly to Lehman; that Brown asked him if he had given plaintiff the chairs and he said "not to my knowledge." Brown then told him to disregard plaintiff's telegram.

Marchbanks, testifying for the defendants, also stated to the effect that he did nothing to bring about the arrest of plaintiff. Thurman, testifying for the defendants, said that no person connected with the theater requested the police to arrest plaintiff. Sexton, testifying for the defendants, denied that he gave the chairs to plaintiff. There was evidence on the part of the defendants tending to show that there were no chairs stored in the plenum chamber and that all the chairs stored in the basement of the theater were good chairs and were placed in the property room, which was in charge of the property man.

The petition alleges that plaintiff was arrested by the police department and the defendants "without legal warrant of arrest and under protest;" that "such arrest was as a direct result of a charge, order, request, inducement or instigation of the defendants' agents and servants, and each of them, by and through their manager and agents, all concurring and jointly co-operating." The petition then sets out the damages which plaintiff suffered as a result of the arrest "all because of the aforesaid wrongful acts of defendants."

The petition then alleges that the acts of the defendants in connection with the arrest, "were grossly unjust and unfounded as aforesaid; that said arrest and imprisonment was without warrant or authority of law and that said acts were high handed and oppressive and without any charge being filed or made against him in any court and as such entitled this plaintiff to punitive damages."

The answer alleges that sometime prior to October 19, 1931, some persons unknown to the defendants wrongfully removed from the theater building fifty chairs belonging to the defendant, the Kansas City Junior Orpheum Company; that being unable to find said chairs defendants reported the loss to the police department. "That, thereafter, said police department made an investigation of the matter and whatever was done in reference to the plaintiff was done by the police department, after it had made an investigation of the facts and circumstances and was done on its own authority and responsibility as police officers. That the plaintiff confessed and admitted to said police that he had taken the chairs in question, and the defendants state that the action taken by the police in the matter in reference to the plaintiff, was because of the confession and admission of the plaintiff, that the alleged unlawful arrest complained of by plaintiff was because of such admission and confession and was made by lawful police officers of the police department of Kansas City, Missouri, on their own authority and responsibility and upon reasonable grounds and with probable cause to suspect and believe the plaintiff was guilty of wrongfully taking the chairs above referred to."

Defendants insist that the court erred in refusing to give their instructions in the nature of demurrers to the evidence; that the only connection that the defendants had with the arrest is that they reported to the police department the disappearance of the chairs in question and had the police make an investigation, which led to plaintiff's arrest, and that the evidence fails to show that defendants ordered, requested, induced or instigated the arrest.

There was ample testimony tending to show defendants' connection with the arrest. The evidence not only shows that defendants called in the police officers to make an investigation but that Marchbanks gave officer Frederick plaintiff's address and that, in order

to assist the officer in making the arrest, he called up plaintiff over the telephone and represented himself to be a representative of the Pantages Theater, saying to plaintiff that there was a prospect of a position for him at that place; that after plaintiff was arrested and he appeared at the Mainstreet Theater with his friends and niece Lehman admitted to the plaintiff that he had had him arrested and attempted to get a release from him and, upon being refused this, he told plaintiff that he would prosecute him to the limit. Thereafter the charges were dismissed without being pressed. There was evidence, therefore, tending to show not only that defendants instigated the arrest but actually caused it.

It is insisted that the court erred in refusing to give defendants' instruction No. 5, seeking to tell the jury that plaintiff was not entitled to recover punitive damages. We think that this instruction should have been given.

Plaintiff, in his instructions, sought to recover exemplary or punitive damages in this case on the ground that the acts of the defendants in bringing about the arrest were done maliciously. Defendants contend that malice is not alleged in the petition. We think there is no question but that this contention must be sustained. [Mooney v. Kennett, 19 Mo. 552.] In charging malice it is not sufficient to allege merely that the acts were unlawful or wrongful. Of course, in order for the arrest to be actionable at all and even compensatory damages recovered, the arrest must have been wrongful. The answer did not cure the matter, nor was it cured by the verdict. It is not apparent that the evidence introduced by plaintiff, without objection by the defendants, showing malice, was not competent also to show the connection of the defendants with the arrest and, therefore, subject to an objection. After a careful reading of the record we cannot say that the case was tried upon the theory that malice had been pleaded. However, the theory of the trial, whatever that might have been, could not work a broadening of the issues made by the pleadings. [Gilliland v. Bondurant, 59 S. W. (2d) 679, 686.]

Plaintiff's instruction A reads as follows:

"The court instructs the jury that if you find and believe from the evidence that the defendants, acting by and through their servants and agents, if you so find, without probable cause, if you so find, instigated, caused or procured plaintiff to be arrested on October 20, 1931, by police officers of Kansas City, Missouri, if you so find, and to be incarcerated by said officers in the city jail at Kansas City, Missouri, and that plaintiff was deprived of his liberty and held as a prisoner in said jail thereafter until October 26, 1931, or for any length of time, if you so find, and that on or about October 26, 1931, he was finally discharged from said imprisonment, then your ver-

dict must be for the plaintiff and against the defendants for actual damages, if any, sustained by plaintiff.

"The court further instructs the jury that if you find and believe from the evidence that the foregoing acts, if any, upon the part of the defendants, if any, were done maliciously, that is, without just cause or excuse, then you may allow the plaintiff an additional sum for punitive or exemplary damages."

Plaintiff's instruction B properly defines "probable cause." His instruction C properly defines "malice in fact," and "malice in law" or implied malice, and ends by telling the jury that if it found that the act of the defendants in procuring or causing the arrest of the plaintiff "was wrongful and without just or probable cause, if you so find, you are justified in finding that defendants acted with malice." Plaintiff's instruction A, in so far as it permits a recovery of exemplary damages, is erroneous because malice is not pleaded in the petition, as we have already stated.

Various other complaints are made of the giving of plaintiff's instruction A and also of his instruction C. The definition of implied malice contained in plaintiff's instruction A was not full enough and, therefore, not a proper one. Implied malice is defined to be the intentional doing of a wrongful act without just cause or excuse. The courts have construed this definition to mean that the thing done must not only have been wrongful but it must have been known by the actor to have been wrong. [Davis v. Chi. R. I. & P. Ry. Co., 192 Mo. App. 419, 426.] Plaintiff's definition of implied malice or "malice in law," contained in his instruction A and that contained in his instruction C are in conflict and, therefore, his instruction A is erroneous in so far as effecting the matter of punitive or exemplary damages. Complaint is made of plaintiff's instruction C because it tells the jury that it would be justified in finding that the arrest was malicious if it was wrongful and without just or probable cause. It is not true, as a matter of law, that an arrest is malicious because it is wrongful and without just or probable cause and it was for the jury to draw what inferences it saw fit from the fact, if they found it a fact, that the arrest was so made. Telling the jury that if the arrest was made such a finding would be justified was tantamount to saying to them that it would meet with the court's approval on the facts. Therefore, the instruction was a comment on the evidence. The courts have gone no further than to state that malice *may* be inferred from want of probable cause. [Hutchinson v. Sunshine Oil Co., 218 S. W. 951, 954.]

It is insisted that there is no evidence of maliciousness in this case, that is, that there was an intentional doing of a wrongful act by the defendants known to have been wrong. It is quite apparent

that there was ample testimony for the consideration of the jury on the question as to whether the arrest was procured or caused by defendants under such circumstances as to constitute malice and it is unnecessary for us to again detail the testimony. In discussing this point defendants violate the rule that all of the testimony, together with all reasonable inferences to be drawn therefrom, must be taken in its most favorable light to plaintiff. The evidence shows that Lehman refused to drop the prosecution unless plaintiff would execute a release in favor of the defendants and told him that unless he signed the release he would be prosecuted to the limit and, thereafter, Lehman dropped the prosecution. These acts of Lehman, alone, are sufficient for the consideration of the jury on the question of malice. [Schuler v. Hughes, 52 S. W. (2d) 453; Hutchinson v. Sunshine Oil Co., supra.]

It is insisted that instruction A is further erroneous because it does not require the jury to find that the arrest was without legal warrant or that the same was wrongful or unlawful. The general rule is that where a detention against the will of the detained has been established the law presumes that the arrest was unlawful and the burden is upon defendant to justify it. [25 C. J., p. 539.] However, to make out a *prima facie* case in this State, not only the imprisonment against the will of the plaintiff must be shown but that it was unlawful. [Wehmeyer v. Mulvihill, 150 Mo. App. 197, 205; Burton v. Brennan, 58 S. W. (2d) 740.] An officer at common law has no authority to arrest, without a warrant, a person charged with the commission of a misdemeanor except where the offense is committed in the officer's presence. However, under the provisions of the statute, sections 7508 and 7509, Revised Statutes 1929, a police officer of Kansas City, if he has reasonable grounds to suspect that a crime has been committed, has authority to arrest without a warrant for a misdemeanor even though the offense is not committed in his presence. [Wehmeyer v. Mulvihill, supra; Hanser v. Bieber, 271 Mo. 326.] The protection of the statute is one that a defendant may or may not invoke and if a defendant desires its protection facts bringing him within the statute should be pleaded. This, we may assume, defendants did in their answer. However, having pleaded it, the burden was upon defendants to prove that the officer had reasonable grounds to suspect that a crime had been committed by plaintiff when he arrested him without a warrant. [Wehmeyer v. Mulvihill, supra, 1. c. 209, 210.] All that it was necessary for plaintiff to do to make out a case in this instance was to show that he was arrested without a warrant. [Hanser v. Bieber, 1. c. 336; Thompson v. Buchholz, 107 Mo. App. 121, 124.] Plaintiff's instruction A does not submit whether plaintiff was arrested without a warrant but as that fact was ad-

mitted there was no necessity of submitting it. The burden shifted to defendants to show some justification for the arrest, that is, either that plaintiff was guilty, if pleaded as a defense, or that the officer had reasonable grounds to suspect his guilt. [Wehmeyer v. Mulvihill, supra, l. c. 210.] There is no contention that the evidence conclusively shows that plaintiff was guilty. Justification being the defense, it was unnecessary to submit the matter in plaintiff's instructions, as it was covered in defendant's instructions. [25 C. J., pp. 531, 535, 538, 539; Thompson v. Buchholz, supra; Hanser v. Bieber, supra; Wehmeyer v. Mulvihill, supra; Burton v. Drennan, supra; Heigold v. United Rys. Co. of St. Louis, 308 Mo. 142; Meily v. Railroad, 215 Mo. 567.]

The instruction has the jury find that the arrest was made without probable cause. Probable cause has no place in a plaintiff's case for compensatory damages in a suit for false arrest, although it does have in a case for malicious prosecution. However, it is unnecessary to rule as to the effect of the inclusion of the element of probable cause in the instruction upon the question presented, for the reason that its inclusion only imposed an additional burden upon the plaintiff. [See Wehmeyer v. Mulvihill, supra, l. c. 210.]

It is insisted that plaintiff's instruction A is erroneous because it authorizes a verdict for the plaintiff without having the jury find that the arrest was unlawful. As before stated, the presumption is that an arrest for a misdemeanor, made without a warrant, when the crime is not committed in the presence of the arresting officer, is unlawful. Therefore, the instruction was not erroneous for not submitting, expressly, to the jury the question as to whether the arrest was unlawful.

It is insisted that the instruction is erroneous because it fails to submit whether defendants' agents and servants were acting within the scope of their employment in doing the things mentioned therein. However, defendants' requested instructions, in this respect, are worded the same as plaintiff's instructions and defendants are estopped to complain of the error, if any.

However, it is claimed that the petition alleges that the acts of the defendants were wrongful and, plaintiff having so characterized the arrest, he assumed the burden of having the jury so find it. The petition, before characterizing the acts of the defendants as wrongful, sets forth the facts upon which the alleged wrongful acts were predicated. The petition having set forth the acts done by the defendants in connection with the arrest, showing that they were unlawful, the subsequent characterization of such acts as wrongful did not add anything to the allegation of facts. A pleading must be determined from its substance and not by the legal verbiage to be

found therein. [Burns v. Ins. Co. of Pa., 224 S. W. 96, 98.] We have examined the cases of Billingsley v. Kline Cloak Co., 196 Mo. App. 534, and Mason v. Downtown Garage, 53 S. W. (2d) 409, cited by the defendants and find them not in point.

It is said that the instruction broadens the issues presented by the pleadings for the reason that it allows the jury to find, among other things, that defendants caused the arrest, when such was not pleaded in the petition. The petition alleges that the arrest was the direct result "of a charge, order, request, inducement or instigation of the defendants." In this connection defendants say that the word "caused" is broad enough to include countenanced, encouraged and approved. In the case of Burke v. Robinson, 271 S. W. 1005, 1006, 1007, it was held that one, who encourages, incites, countenances or approves an arrest, has caused it. However, the words "countenances, encourages or approves" in this connection are not to be taken in their broadest sense. If one merely states the facts to an officer, leaving it to him or his superior to act or not as they see fit, he is not liable for a false arrest made by the officer. [Vimont v. S. W. Kresge Co., 291 S. W. 159, 160.] Merely calling the police and stating the facts which set in motion an investigation by the police that afterwards results in the arrest of a person, might in a broad sense, be construed to mean that such person countenanced or encouraged the arrest. However, in order that there should be a countenancing, encouragement or approval of the arrest something of an affirmative nature must be taken by the defendant. In other words it must be shown that he was connected with the arrest, in some manner more than merely calling the police and stating the facts. In view of these considerations and the rule that the petition, after verdict, must give a liberal construction in favor of the plaintiff, we are of the opinion that the very broad allegations in the petition, in this respect, are sufficient to justify the submission of the question as to whether defendants caused the arrest of plaintiff in this case.

However, it is claimed, that in using the word "caused" in the instruction, the jury was given a roving commission and were permitted to consider the acts of the defendants in reporting the loss of the chairs; that more than merely reporting the loss of the chairs and aiding in the investigation was necessary to justify a verdict in plaintiff's favor. If the word "caused" used in this connection is one of ordinary meaning there was no reason to define it to the jury, and if it is to be considered as a word of technical meaning, the duty was upon defendants to have offered an instruction defining it and in the absence of so doing they cannot complain. [Berryman v. So. Surety Co., 285 Mo. 379.]

It is insisted that the instruction does not conform to the evidence,

in that it tells the jury that if they found that plaintiff was incarcerated in the city jail and held as a prisoner therein and "thereafter, until October 26, 1931, or any length of time," etc., the verdict should be for the plaintiff. In this connection it is pointed out that plaintiff's testimony shows that he was held in jail parts of two days, only, and not from the time he was arrested, on October 20, 1931, until October 26, 1931. However, defendants admit that this matter. has a bearing upon the amount of damages assessed and as the instruction, plainly, was not on the measure of damages it would seem that plaintiff merely assumed, in this respect, an unnecessary burden, if any. In addition to this, the verdict for compensatory damages is a modest one and there is no contention that it is excessive. [Shinn v. United Rys. Co., 248 Mo. 73; King v. St. Louis, 250 Mo. 501, 504.]

It is insisted that the court erred in giving plaintiff's instruction D, which reads as follows:

"The court instructs the jury that the defendants' connection with the arrest and imprisonment of the plaintiff, if any, does not have to be proven by direct and positive evidence, but may be established by facts and circumstances in evidence, from which such connection, if any, may be reasonably inferred."

There is no merit in this contention. [Peterson v. Fleming, 297 S. W. 163.]

It is claimed that the court erred in giving plaintiff's instruction E on the measure of damages, in that it submits to the jury for its consideration, in this connection, the following, in part: "You may take into consideration the mental anxiety of plaintiff occasioned by reason of said arrest and imprisonment, if any, the mental suffering occasioned by such arrest and imprisonment, if any," etc.

It is insisted that mental capacity and mental suffering are one and the same and that the instruction permits a double assessment of damages for the same thing. As the verdict for compensatory damages is a modest one and there is no contention that it is excessive, the instruction was not prejudicially erroneous. [Shinn v. United Rys. Co., supra; King v. City of St. Louis, supra.]

It is claimed that the instruction does not limit the recovery of special damages to the amount thereof claimed in the petition. This is true. As to such damages, the petition alleges that plaintiff was forced to incur expenses in procuring bonds and engaging counsel, in an amount aggregating $250. The evidence shows that plaintiff has incurred an expense of $150 for attorney's fees. and one of $40 in obtaining bail bonds, or a total of $190. These items were less than the amount of such damages claimed in the petition. The jury is presumed to have allowed an amount for these items no larger than

the evidence justified. The instruction, therefore, cannot be adjudged to be materially erroneous. [Laycock v. United Rys. Co., 290 Mo. 344.] While plaintiff has not paid his attorney he is legally obligated to do so. Therefore, he has incurred the expense of an attorney, as alleged in the petition.

It is insisted that the court erred in giving the jury the forms of verdict. There is no form of verdict submitted which permits the jury to find in favor of either one of the defendants and against the other. However, the theory of plaintiff's instructions is that neither one of the defendants was liable unless both were. In other words, the jury could not find against any of the defendants unless both were guilty of the acts of false arrest submitted in his instructions. Under such circumstances, the forms of verdict submitted to the jury were proper. [Daniels v. Phillips Pet. Co., 73 S. W. (2d) 355.]

Complaint is made of the modification of defendants' instructions numbers 10 and 13. Under these instructions, as offered, defendants were exonerated if they did not *request* the police officers to arrest plaintiff or *request* or *direct* them to hold him in custody. The court changed the instructions by striking out the word ''request'' and inserting the word ''caused.'' From what we have said, there was no error in the court so doing. The defendants were not exonerated if the jury found merely that they did not request or direct the arrest. The petition is broad enough, not only to charge these matters, but that the arrest was instigated or caused by the defendants. From what we have said defendants could have been held for instigating or causing the arrest, even though they did not request or direct the same.

The court properly modified instruction No. 10 by inserting the word ''solely'' so as to provide that defendants should not be exonerated if they caused the arrest even though the officer made the arrest because, in his judgment, he should have made it.

Complaint is made of defendants' instruction No. 11 as amended. Said instruction reads as follows, with the amendment in italics:

''The court instructs the jury that if you find and believe from the evidence that the chairs in question were wrongfully taken from the theater known as the Mainstreet Theater, by the plaintiff, and without the consent of the defendants, *their agents or servants*, then plaintiff is not entitled to recover and your verdict must be for the defendants.''

It is insisted that the amendment does not confine the agents and servants of the defendants to those duly authorized. The instruction, as offered, is not as clear as it might have been, for the reason that no consent of Lehman, representing himself, personally, was necessary to the taking of the chairs, as the chairs were not his and, in

fact, there is no testimony that Lehman did consent to their taking. As to the defendant, Kansas City Junior Orpheum Company, it was a corporation, and could not act except through its agents. While it is true that the whole instruction became the court's when it was modified and defendants are not responsible for it, still, this instruction, as offered, as well as the other instructions offered by defendants, refers to the acts of the defendants as those of the "defendants" without adding anything about those acts being committed by agents or agents acting within the scope of their authority. This clearly disclosed a theory of submission, in this respect, on the part of the defendants, that is, that the jury was to judge for itself as to what persons had authority to bind the defendants. Defendants will be bound upon this theory on appeal. The jury were told, in effect, in all of the instructions that they could not find against Lehman without also finding against the corporate defendant, which, as before stated, could act only through an agent or agents. The instruction, as amended, was an improvement on the one offered and in view of all of the circumstances we do not believe it to have been prejudicially erroneous.

The instruction first had the jury find that the taking of the chairs was wrongful and then an apparent additional burden is cast upon defendants to show that they were taken without consent. However, it appears that the part referring to lack of consent merely explains what the court meant by the use of the word "wrongful."

From what we have said there was no error in the trial of the cause effecting the judgment as to actual damages. However, the amount assessed as punitive damages cannot be sustained. Therefore, if plaintiff, within ten days, will remit the amount of the punitive damages in the sum of $750, the judgment will be affirmed. Otherwise, it will be reversed and the cause remanded. *Shain, P. J.,* concurs; *Trimble, J.,* concurs in part and dissents in part in separate opinion.

CONCURRING OPINION.

· TRIMBLE, J.—The main opinion denies recovery of the $750 punitive damages awarded by the jury, the ground of such denial being that malice is not pleaded in the amended petition on which the trial was had. It is true, the word "malice" was not used in the amended petition. But it seems to me that sufficient facts were pleaded from which malice in law necessarily appears. The sufficiency of a petition must be determined from the substance thereof and not by the legal verbiage to be found therein [Burns v. Ins. Co. of Pa., 224 S. W. 96.]

After alleging that plaintiff is and was at all times a resident of Jackson County, Missouri, the petition stated that:

Plaintiff "was arrested at his home by members of the Metro-

politan Police Department of Kansas City, Missouri, and by these defendants, all without legal warrant of arrest and under protest; that such arrest was, as a direct result of a charge, order, request, inducement or instigation of the defendants' agents and servants, and each of them, by and through their manager and agent, all concurring and jointly cooperating. . . .

"By reason of such inducements and instigations by these defendants, their agents and servants, concurring and jointly cooperating, he was imprisoned from October 20, 1931, and at considerable expense, inconvenience and anxiety and humiliation to himself and under the orders and commands of these defendants, police officers and courts, until October 26, 1931. . . .

"Said arrest, imprisonment and restraint as aforesaid was as a result of a charge, order, request, inducement and instigation of the defendants, their agents and servants, concurring and jointly cooperating; that said defendants, their agents and servants, did arrest and charge this plaintiff with a wrongful act purported to have been committed by him and that said defendants concurrently and jointly cooperating did cause his arrest and detention and imprisonment as aforesaid, with great mental anguish, anxiety, humiliation, mortification, physical and mental suffering, profound nervousness and injury to his health and character, shame and embarrassment before his friends and neighbors, was compelled under arrest to repeatedly return to said police station and to the custody of the law and was placed in and compelled to go through what is known as the 'show up,' being viewed by officers and many other persons, being compelled to procure bonds and to engage counsel and to incur necessary expense and outlay in an effort to obtain and protect his legal rights in amounts aggregating two hundred fifty dollars special damages; and that he still suffers shame and embarrassment before his friends and neighbors and that his previous good standing in the community in which he lived and labored for his livelihood and among those with whom he had mingled, has been greatly impaired all because of the aforesaid wrongful acts of defendants and their duly authorized officers and agents acting in the scope and performance of their duties.

. . .

"Said order, request, charge, inducement or instigation and acts of the defendants and each of them concurrently and jointly cooperating were grossly unjust and *unfounded* as aforesaid; that said arrest and imprisonment was without warrant or authority of law and that said acts were high-handed and oppressive and without any charge being filed or made against him in any court, and as such entitled this plaintiff to punitive damages in addition to other damages suffered and incurred in the additional sum of . . . ," etc. (Italics mine.)

No objection to, or attack, was made upon the petition. And punitive, as well as actual, damages were asked therein.

The petition is not required to use the words "malice" or "maliciously" in order to include a charge of malice so as to support a verdict for punitive damages. In this case the acts charged were that defendants accused plaintiff of *theft* (*per se* a criminal, shameful and dishonest offense), and had him arrested without authority of law, such charge being *unfounded* and the arrest grossly unjust, and said arrest and imprisonment were without warrant or authority of law, high-handed and oppressive and without any charge being filed or made against him in any court, entitling plaintiff to punitive damages in addition to the other damages suffered, for which judgment is prayed. It seems to me that this is sufficient to charge defendants with intentionally doing a known wrongful act. Even if one does an act for which probable cause exists, yet he may do it in such a high-hand, oppressive and grossly unjust, manner as to reveal malice in that way. [Hutchinson v. Sunshine Oil Co., 218 S. W. 951.]

The case of Mooney v. Kennett, 19 Mo. 552, cited in support of the ruling made in the majority opinion, was one in which the plaintiff was arrested for an alleged *violation of a city ordinance* (possibly leaving his truck in the street). It was not a criminal offense, or one involving moral turpitude or shame. His accuser might honestly think a violation of law had been committed and have no malice. Hence knowingly causing his arrest would not, of itself and without more, show malice, but facts must be alleged in addition to that in order to allege malice. In the cited case, no ordinance was pleaded nor proved. It had to be pleaded in order to get into the record, since the court will not take judicial notice of a city ordinance. Nor was there pleading or showing that plaintiff had been acquitted. The case was reversed in its entirety, not because of any mere failure to plead a case for punitive damages. I do not deem it in point under the circumstances in the case at bar.