**Glenn and Doris BOWER, Frank and Minnie Bower, Respondents,**

**v.**

**HOG BUILDERS, INC., Appellant.**

No. 54736.

Supreme Court of Missouri, Division No. 2.

Dec. 14, 1970.

Motion for Rehearing or to Transfer to Court En Banc Denied Jan. 11, 1971.

Strop, Watkins, Roberts & Hale, Dan Hale, Lynn K. Ballew, St. Joseph, for re-

spondents; James W. Jeans, Kansas City, of counsel.

Sprague, Wilcox & Houts, St. Joseph, for appellant.

PRITCHARD, Commissioner.

Plaintiffs owned farms to the south of and adjoining defendant's 139-acre farm in the northern portion of Clinton County, Missouri, which it used for breeding, raising and the sale of hogs. All four plaintiffs joined in suing defendant because of a nuisance it was alleged to have created by causing noxious odors, depositing large amounts of waste in open lagoons and causing them to discharge onto plaintiffs' properties, placing hog pens and lagoons on its land so that surface waters were accumulated and after contamination unreasonably discharged the waters onto plaintiffs' lands. All four plaintiffs joined in Count I for injunction, but that count was denied by the court and is not here in issue. Glenn and Doris Bower sued on Count II for actual and punitive damages, which resulted in a jury verdict for them of $34,200 actual and $60,000 punitive damages. Under Count III, Frank and Minnie Bower were awarded $12,000 actual and $30,000 punitive damages by the jury.

Ten points are made by appellant, the first of which attacks the submissibility of plaintiffs' case; four points relate to claimed erroneous giving of instructions; one presents as error in permitting questions on voir dire examination relating to other (affiliated to plaintiff) corporations; one, with four subpoints, to the admission and exclusion of evidence; one, with two subpoints, relates to final argument; one claims error of the court in misstating the law in the jury's presence; and the final point is that "The verdict is against the weight of the evidence and is so excessive, both for actual and punitive damages, that it had to result from bias and prejudice of the jury."

The two farms of the plaintiffs are approximately 13 miles east of St. Joseph, Missouri, and are located on the south side of an east-west graveled county road. The farm of Glenn and Doris, adjoining that of Glenn's father, was bought by Glenn about 20 years ago, and the buildings were thereafter improved by him. Prior to the time defendant came there, the air and streams were pure and there was no bad odor in the air. Glenn then had no trouble with rats, and there was just the normal amount of country flies. He had a good clear water pond in which his nephews could swim and fish, and from which the livestock could drink. He had another older pond which also had fish in it. The house was equipped with a patio where Glenn and Doris entertained their friends many times. They had no trouble drinking their water, it being good soft water. Glenn's occupation most of his married life was that of a house building contractor in the St. Joseph area and around his home.

Defendant established its hog breeding operation in the first part of 1965, the first hog houses being located on the northern part of its property. Glenn's farm and that of defendant were situated on gentle rolling farm country. Glenn was on the downhill slope from the hog farm which had a (northwest-southeast) ridge on it, from which the water drained in all directions, and the fall of the land to the southwest was downhill across Glenn's farm and also that of his father to his west. A "cesspool" was built on the south slope of the hog farm before a second group of hog houses was built. Glenn observed the lagoon overflowing and running down the stream. At that time Glenn started conferring with the health department, the water pollution people and the manager of the hog farm. Thereafter, four other buildings were constructed on the hog farm, and defendant started raising hogs in them and filling the lagoon. According to Glenn, who had been in the buildings, they were near 30 feet wide and 130 feet long. There was a cement floor and a pit in the middle with a slat floor over it. At least 40

pens were placed on each side of the pit. The sides of the buildings had cement blocks for 3 or 4 feet, above which was car siding. Flap doors were provided which could be raised to let the odor out. The roofs were metal with four ventilators on each. The trough in the middle of the buildings, containing "manure and stink and waste feed and urine and water," was near 8 feet wide and 5 feet deep. The hogs were fed by means of an overhead elevator which spilled feed out on the floor, and there were drinking cups on the inside of the pens. The holding tanks were connected to a ground pipe which dumped into the lagoon.

The lagoon north of Glenn's home was constructed after he saw the west (first) lagoon (which did not drain onto his property) overflowing in 1965 from the overflow pipe. Glenn reported this overflow to the State Health Department and to Mr. Jack Smith of the Water Pollution Board. Mr. Smith observed a small overflow to the northeast from a lagoon, and suggested to defendant's manager that it be stopped. As the weeks went along the second lagoon with manure, stink, waste and rotten feed flushed from the pits of four buildings, "and as days went by it filled up faster than you could imagine, and the day came when over the top it went." The lagoon was a rectangular shape about 120 feet by 160 feet, and was about 4 feet deep. It filled in the latter part of 1966 and went over the top of the dam early in 1967. Glenn complained, and the lagoon was raised a little. In January, 1968, the plug blew out of the drain pipe and flooded Glenn's pond after which defendant built up the side of the lagoon and covered up the pipe. After the lagoon filled up in the summer of 1967, the black manure came over the top of the dam very often, and on following the flow Glenn found it ran in a southwesterly direction down a water ditch and on his property about a half mile.

Early in 1968, defendant constructed another lagoon above the second one, which filled to rim capacity, then ran over the top of the dam and continually seeped from its west side, taking the same course as the lagoon below it. In January, 1969, defendant constructed a third lagoon in the same (east) area. Glenn saw people on the hog farm using a power-driven pump and hose pumping out of the lower lagoon over the dam, after which the "crud" followed the course of the natural drainage down the north ditch of the road to Glenn's driveway.

Glenn identified Plaintiffs' Exhibit 5, a photograph looking north across the road from his place, showing a water ditch filled with erosion. Other exhibits show the ditch and the south end of the tubing draining from the hog farm, and although in black and white show accumulated, flowing sludge, and according to Glenn they show manure and debris. On the north side of defendant's property is its water supply pond which has a diversion terrace to keep the holding pens from draining therein. No such diversion terraces were constructed on the three southeast lagoons to keep the runoff from coming onto Glenn's property.

As to the odor, Glenn testified "It is the most stinking, rotten, putrid, nauseating odor I have ever smelled bar none." It is there continually. His home was not air conditioned, and the odor was in the bedclothes, closets, drawers, car, barn and the shop. The odor and pollution of the vicinity upset the high school life of Glenn's daughter, Donna Denise. He noticed a difference in his drinking water, and he and his father have been overrun with rats since the hogs came. The number of flies seemed greater, and Glenn saw a lot of the big, green blow flies. Glenn's friends, as they would go by the road by the edge of the lagoons, would salute him by holding their noses. On January 18, 1968, he had entertained friends, one couple (the Kerns) departing about 11:00 p. m. They returned shortly and Glenn accompanied them down his driveway. He there saw the "filthiest, stinkenest, overflow out of a septic tank" he had ever witnessed. He followed it up

his lane for 200 feet, and up the north side of the road, stepped on the hog farm property to the outlet of the septic tank. Glenn identified a color photograph showing the outlet, which he testified was a piece of fiber pipe 6 inches in diameter reduced to a 4 inch 90 degree (vertical) L with a piece of burlap pushed in the end of the L. The overflow pipe was located near the east end of the dam. When he went to the dam he saw a piece of plyboard lying on the side of it over the flow of black liquid. The plyboard was staked down at its top, and on its being raised Glenn saw the pipe plugs lying there with the 4-inch pipe adaptor. Other color photographs were taken by Kerns of that scene, and others were taken the next morning after defendant had shut off the flow. Glenn called his neighbors, James White and John Pipes, the conservation agent, Mr. Rice, and the sheriff's department. As a result of the flow, in about eight hours Glenn's pond was filled and the flow went on into Jordan Creek.

In January, 1967, Glenn took pictures of his west pond showing dead fish. In July, 1968, there were catfish killed in the other pond in front of Glenn's house. Three photographs show a decomposed hog which was lying on the hog farm right across from Glenn's property in the summer of 1967. The waste also killed vegetation on the north side of the road. In the last several months (before trial) the liquid inside the cesspools was almost blood red. Glenn's cattle, when he had them at home, would not drink from his pond or his father's pond. The ditch on the north side of the road was 10 feet wide at its bottom and 3 to 4 feet deep prior to the operation of the hog farm, and thereafter it became level with the road 95% of the distance, except at the tubing in front of Glenn's driveway.

Glenn gave his opinion that his 58-acre farm had a value prior to the time the hog farm operation started and as of December 31, 1964, of $72,000. At the time of trial, his opinion was that his farm had a value of $20,000, a depreciation of "at least $52,000." Prior to the hog farm operation it was Glenn's opinion that his father's farm had a value of $57,000, and afterward the value was $16,000.

There was a well on Glenn's farm, and when the hog farm started operating they got an odor in the water. He then had a test made of the water by Dr. Baird, the health officer in the City of St. Joseph. The substance of Dr. Baird's report was "that if this water was in a swimming pool in St. Joseph, they couldn't even go wading in it." Thereafter, Glenn's wife began boiling all the water used in the home.

Doris Bower's version of their situation was this: Before defendant acquired the property across the road from the Bowers the air, water and ponds were clear. Defendant's property had been in the past used as a wheat field and for cattle grazing. Since defendant came, pond fishing, stream wading, and mushroom hunting ceased. Doris took the picture of the dead hog which was just across from them outside defendant's fence and in the ditch line. She also took pictures of the dead fish in their pond in June, 1967, when they started dying. On June 23, 1967, a day when the odor was unbearable, Doris and her daughter Denise were both sick at their stomachs. (On cross-examination Doris did not relate the sickness to the hog farm operation.) Up to July 13, 1967, there was only one lagoon serving four buildings, and on that day defendant started bulldozing another lagoon. On January 19, 1968, Doris again observed foam in the ditch along their lane. In March, 1968, the water in the pond was black, as shown by a color photograph. After a period of time without rain, there came one on July 16, 1968, and the water came over the road, the ditch being full of eroded dirt, after which she noticed the dead fish in the pond. The same thing occurred on July 23, after a rain. On July 25, 1968, the ditches on both sides of the road were full of filth and the odor was unbearable. In October, 1968, there was a mudhole from drainage off the

hog farm onto the road in front of the Bower's house and in their driveway. On December 20, 1968, defendant started bulldozing a third lagoon at which time the other two were full and overflowing. On January 16, 1969, it became warm, the snow thawed, and water was running off the lagoons. Doris looked at the lagoon and saw red water running, which was the same color as in the mudhole in the road. She took a sample of the water in the road. A slide color photograph shows the pump operating out of the lower lagoon, which Glenn referred to in his testimony. On cross-examination Doris testified that she boiled the water used in the home for about a year, and then ceased. The odor from the farm was not constant—there were days when they did not notice it.

Denise Bower testified that prior to the hog farm operation she had school activities with schoolmates at the Bower farm. At one time there were forty girls present at a wiener roast in the front pasture. After the hog farm operation started it was impossible to have them again because of the odor, which definitely hurt Denise's social life when she wanted to have friends in her home.

Mrs. Frank (Minnie) Bower and her husband lived on their place to the west of Glenn and Doris since 1917. Prior to the time defendant started its operations the air was pure and enjoyable, and the water was clear and pure in the wells and the creek (from which Frank drank while in the fields working). Since the hog farm began operation the odor has been real bad at times, the like of which she had never smelled before. She has seen the black crud, sludge pollution coming off the hills and out of the open cesspools, running across the road, over onto Glenn's property, then onto their own property.

Frank Bower came to the area when he was sixteen years of age. Back through the years, before defendant put in its hog farm across the road, the rural place was "the garden spot of the world" with good water and the creeks clear and nice. He was never bothered with rats until the last three or four years. The rats got into his corn field and ate corn off the cobs causing him to sort out the cobs before selling the corn. The odor was bad, "it couldn't be any worse"; it made his eyes smart and caused him to get off his tractor and vomit.

Phillip Rice was the regional supervisor for the Department of Conservation, a part of his duties being pollution investigator in 17 counties in northwest Missouri. He was in the vicinity of defendant's farm in July, 1967, in response to a telephone call from Doris Bower in regard to fish kills. Officer Ticknor accompanied Rice and waded up Jordan Creek about 2 miles from the hog farm, there finding several dead fish, bullheads, crayfish and green sunfish, which had been killed somehow in the past 24 to 36 hours. The stream had a cast in it which would indicate a high organic content in the water, and it had a definite odor about it. The content became greater as they went upstream, and west of Frank Bower's residence it was more intense and had the odor of hog manure. Rice was at the place again on January 18, 1968 at 11:05 p. m. He then saw black effluent coming out of a fiber pipe under a piece of plywood from the first lagoon. There were no criminal charges filed against defendant as a result of Rice's investigation.

Conservation Agent Paul Ticknor was at the Glenn Bower home on June 20, 1967, and then observed the dead fish in the west pond—bullheads, channel catfish, bass and green sunfish. There were "several bullheads piping at the surface in the pond," and organic material floating on the surface. On July 12, 1967, with Rice, he waded up Jordan Creek from Highway 36. He observed dead fish and a prevalent odor which became worse as he agitated the bottom of the stream, which was murky. On January 18, 1968, Ticknor followed the effluent and foam from the lagoon to Glenn's pond.

Deputy Sheriff Chalmer Peters was present when the plyboard was lifted on the lagoon showing a pipe with black sludge pouring out of it, then running down the hill to Glenn Bower's property. He saw a piece of frozen burlap and an elbow lying by the pipe.

Billy G. Kerns and his wife discovered foam in the road as they left the Glenn Bower's residence. The car heater picked up the odor "and you couldn't hardly stand it." Billy got out of his car and saw where the sludge was coming from and informed Glenn.

The Kerns live to the northwest of the Bowers, and when the wind was from the northwest coming through a kind of valley they had the same problem as the Bowers. The odor was not the same as produced in a general agricultural area. A concentrated hog operation has a different odor than any other type of hog operation. Billy held up the plyboard at the lagoon and got the water pretty well all over him. His wife would not let him in the house later until he took off all his clothes, and he could smell the odor on his hands a week later.

James L. White lived "a strong quarter of a mile southeast" of defendant's hog farm. Since it was established he had noticed a difference in the quality and nature of the odors prevalent in the neighborhood. He compared the odors to that of maggot-filled bones not under refrigeration when he worked for Swift and Company, an ammonia-like gas. The odor has been in his own home when the wind was from the north coming down from the hog farm ridge. White never before had rats, but had them after the hog farm started. He had seen discharge from the lagoons coming down across the road. He saw the pumps at the lagoons and imagined that they were pumping from one to the other.

Mrs. Doris Kerns testified that before defendant came she never noticed "this overwhelming vile, suffocating smell, com-

ing from the area of the biggest hog raisers in the vicinity." Since the hog farm operation began, its odor was in her home, there being days when it was worse, according to the wind and the humidity.

Dr. Ron Miner was an Assistant Professor of Agricultural Engineering at Iowa State University, Ames, Iowa. He had done pollution research, sewage treatment plant design, and stream investigations for the Department of Health of Kansas. He had written some papers on cattle feed lot runoff, and had done (and was currently doing) work on odor research at Iowa State, and also some work on management and treatment of swine waste. Without much success he had been able to isolate and duplicate certain chemical gases which were comparable to (but not exactly the same as) swine odors in a hog raising building similar in design to those of defendant. Dr. Miner explained the difference between "anaerobic decomposition" and "aerobic decomposition": the first is decomposition that takes place without oxygen being present, such as in septic tanks and cesspools; the latter takes place in the presence of oxygen, as in a trickling filter or activated sludge-type sewage treatment. The first has an end product of hydrogen sulphide, ammonia and methylene, "or the foul-smelling ones," and is a result of bacterial action. The anaerobic decomposition odor situation has the definite characteristics of clinging to fabrics, clothing, hair and so on. This was demonstrated by Dr. Miner in the exhibition of a sweater he hung in his laboratory pen for two days, then sealed and brought to the trial, and also another sweater which he had hung in defendant's building for 1½ hours. As the temperature increases the decomposition accelerates and allows more gases to escape into the air. An anaerobic lagoon is not designed or intended to be a final waste treatment device—it does not get rid of anything and does not produce an effluent acceptable for discharge, which discharge is some five to ten times the concentration of untreated domestic or munici-

pal sewage. "Lagoons are principally storage devices until a more convenient time or a more convenient method for disposal is achieved," as prior to spreading the manure on the ground.

Dr. Miner made an investigation of defendant's operation on March 11, 1969, the day before trial started. In the one building he entered he did not find as strong an odor as he expected, and in attempting to get a liquid manure sample out of the storage pit he found the sample was essentially fresh manure without significant decomposition—indicating the tank had been recently filled with relatively clear water and had only a very limited manure accumulation in it.

On cross-examination Dr. Miner testified that defendant's buildings were of the popular type, the prime consideration being how to mechanize feeding, for which they do nicely. He would not say defendant's lagoons had a good design, except that the slopes were well done and the dikes nicely maintained. He explained the design in this manner: where additional cells for storage capacity are added in a series, it means that the initial cell is overloaded which will result in more offensive odors; and there was no provision for proper disposal of effluent. The lagoon system is generally one stage of manure disposal— "It is not the only thing an operator has to do for manure disposal"—as by spreading it on the land when the ground is dry and unfrozen (thus preventing it being carried off by runoff water).

On redirect examination it was developed by Dr. Miner that a seriously overloaded anaerobic lagoon has more offensive odors more often, but the elimination of odors by proper design has not yet come about. The (present) designs assume that something will be done with the effluent rather than the discharge into a stream— either there will be no overflow, which is most unlikely in the midwest, or some alternate disposal method will be used.

Dr. Ted Willrich was a Professor of Agricultural Engineering and Extension Agricultural Engineering at Iowa State University. His primary responsibility was in off-campus education in water supply, treatment and quality, in sewage disposal, animal waste treatment, pollution control, drainage, and erosion control in the area of water and waste. He visited defendant's hog farm in May, 1968, there observing the buildings, the partially slotted floors for manure collection, and the plugs which could be pulled to permit gutters to overflow and enter the upper-west cell. The uppercell lagoon contained brownish water, gas bubbles on the surface which indicated biological decomposition, and there was a scum and a definite asceptic odor. Rat rail maggots (not a nuisance organism) were observed also indicating anaerobic conditions. A deodorant or masking chemical odor was also detected, making it difficult to detect the true septic odor of the lagoon. The masking odor was unpleasant and apparently clung to their clothing. In another lagoon he observed black water, which indicated a better situation than the brown color with respect to effective anaerobic decomposition. Purple pigmented bacteria on the surface of the water cause it to have a reddish color. These bacteria absorb some of the hydrogen sulphide (a rotten egg odor). Dr. Willrich observed the lagoons later on March 11, at which time the south lagoon was about 4 inches from overtopping; and in the third lagoon the water level had increased indicating pumpage from the upper-second lagoon to prevent overflow in the lower, fourth lagoon. Anaerobic lagooning is not considered to be a final sewage treatment device, but is primary. The waste from an average weight hog is equivalent to the waste from three people. The number of hogs was given Dr. Willrich by defendant's personnel, and using a figure of 3,860 hogs he calculated the total volume of diluted waste per day at 23,000 gallons.

On cross-examination Dr. Willrich testified that with the exception of his sanitary

survey of the open dump, the apparent long-time holding of dead animals, the disposal of pesticide containers in natural water courses, defendant's "general housekeeping is good and above average." The over-all conditions of its lagoons border on a situation where they were very subject to malfunctioning and causing elevated odor conditions.

E. R. Ritchey was at the hog farm taking photographs on January 17, 1969. He observed that pumping was going on at the second lagoon out on the surface of the ground thence running down on the road and into the ditch.

The jury was permitted, on the request of defendant, to go to defendant's farm and surrounding areas and view the same.

In general, defendant's evidence was that it conducted a very good hog breeding farm operation, with adequate lagoons which did not overflow. Further testimony was that the values of plaintiffs' farms were not affected by the hog farm operation, and it did not adversely affect the living conditions of other persons residing in the rural area. Defendant's manager testified that the construction of the lagoons was in accordance with the standards of the Agricultural Engineers' Digest, which it introduced as a photocopy as Defendant's Exhibits E–1 and F–1. The photocopy omits the reverse of the document which was introduced by plaintiffs as their Exhibit 47. The pertinent parts of the latter exhibit are:

"When a lagoon is full, the addition of new wastes will cause some liquid to overflow. In the typical livestock lagoon, the overflow is not completely decomposed and may be a health hazard.

"To avoid pollution, all overflow from an anaerobic lagoon should go into an aerobic lagoon or other waste treatment system for further decomposition. Check with State Health officials concerning overflow from aerobic lagoons and anaerobic lagoons.

* * * * * *

" * * * Sludge accumulation will have to be removed when it causes the lagoon to be inefficient or to mulfunction. * * *."

■ Defendant contends that the court erred in failing to direct a verdict for it because under the facts and circumstances there was no nuisance. The above recitation of facts is therefore set forth in the light most favorable to plaintiffs. Burns v. Maxwell, Mo., 418 S.W.2d 138. Under Point I(A) defendant says that the case being a suit in equity for injunction it is here for review and adjudication by this court on the law and competent evidence. The review is not that of an equity case because the trial court denied the prayer for injunctive relief. The review is that of an action at law where the submission to the jury and resulting judgment will not be disturbed if it is supported by substantial and competent evidence, and the reviewing court will not weigh the evidence. Higgins v. Terminal R. R. Ass'n of St. Louis, 362 Mo. 264, 241 S.W.2d 380; Reames v. St. Louis-San Francisco Ry. Co., Mo.App., 359 S.W.2d 230.

By Point I(B), defendant expands its argument that there was no nuisance because it "was making a reasonable use of its property." It cites and first relies on 66 C.J.S. Nuisances § 8, pp. 744, 741. These pages refer to a nuisance as being the reasonableness or unreasonableness of conducting a business or making use of the property complained of in a particular locality and in the manner and circumstances of the case, and if reasonable no actionable nuisance is created; and (p. 741) to the effect that an owner may use his property as he desires recognizing that same right in another, and "Nevertheless, one may make a reasonable use of his property, even though it may create some annoyance or inconvenience, and doubts should be resolved against restraint in the lawful use of property." But in the same section of C.J.S. (p. 739) it is said, "As a general rule, every unlawful, unwarrantable, or un-

reasonable use by a person of his own property in such a way as to cause material annoyance, discomfort, or hurt to other persons or the public generally, and every enjoyment by one of his own property, which violates the rights of another in an essential degree, constitute a nuisance against which relief may be obtained." At § 23(d), p. 778 of 66 C.J.S., it is said that "it is well established that noxious smells or odors may constitute a nuisance, although they are not unwholesome or injurious to the health but merely offensive and unpleasant." § 33, p. 787 of 66 C.J.S. Nuisances, says that the keeping of pigs, being lawful, is not a nuisance in itself, but such does not justify conducting such business so as to create a nuisance, which may be so by reason of the manner in which they are kept or the locality or both. It is a jury question usually whether a particular act or use of property, which is not in itself a nuisance, is a nuisance in fact. 66 C.J.S. Nuisances § 153, p. 960; Pearson v. Kansas City, 331 Mo. 885, 55 S.W.2d 485, 489 [4–6]. See also 4 Am.Jur.2d Animals, § 65, p. 313.

For its proposition that its use made of its property was reasonable defendant cites Schott v. Appleton Brewery Co., Mo.App., 205 S.W.2d 917, and Fuchs v. Curran Carbonizing and Engineering Co., Mo.App., 279 S.W.2d 211. In the Schott case the action was tried to the court, and the Court of Appeals, viewing the evidence as a whole, found that the trial court's finding and judgment against plaintiffs was not against the weight of the evidence. It was held that there was no doubt that the defendant brewery company had adopted every means within its power to eliminate the escape of soot, smoke, cinders and fly ash through its smoke stack and that while the plaintiffs had suffered some inconvenience and annoyance from the fly ash, others had no difficulty, and that the amount of fly ash was sufficient to create a nuisance was very much in dispute. It was stated in the Schott case (205 S.W.2d l. c. 920) that "It is the law that one may not make such an unreasonable, unusual or unnatural use of his property that it substantially impairs the right of another to peacefully enjoy his property. * * * What is a reasonable use and whether a particular use is a nuisance cannot be determined by any fixed general rules, but depends upon the facts of each particular case, such as location, character of the neighborhood, nature of the use, extent and frequency of the injury, the effect upon the enjoyment of life, health, and property, and the like. The use of property in one locality and under some circumstances may be lawful and reasonable, which under other circumstances would be unlawful, unreasonable, and a nuisance."

In the Fuchs case, similarly to the Schott case, in addition to the statement about the relative rights of the parties, it was said that these elements should have been considered in the determination of a nuisance by appropriate instructions to the jury (279 S.W.2d 218 [7, 8]): "* * * [T]he locality and the character of the surroundings, the nature, extent and frequency of the harm involved, the nature, utility and social value of the use or enjoyment invaded, the effect upon the enjoyment of plaintiff's life, health and business and the health and convenience of the members of plaintiff's family. (Citing cases and authority)." The defendant here seizes upon some of the pronouncements on these standards in its effort to demonstrate that its use of its hog farm premises was reasonable, and therefore that no nuisance was proved. Defendant first says that the location and character of the surroundings are in a country, an agricultural area of rolling slopes and scrubby growth of timber; a not highly productive Shelby type of soil suitable not for much cultivation but for livestock raising area; and (as shown by aerial photographs) the area is sparsely settled. It is said that the distance to the Bowers' residences from defendant's lagoons can be computed from the aerial photographs: Glenn and Doris Bower, over 800 feet, and Frank and Minnie Bower, over 1,800 feet. It is argued

further that Defendant's Exhibits E–1 and F–1 (Agricultural Engineers' Digest) prescribe a minimum lagoon location of 300 feet from any dwelling, and it should be located so that southeast and southwest breezes of summer would carry the odors away. Defendant contends that it loaded, designed and constructed its lagoons in accordance with Engineers' Digest and that the prevailing summertime winds were generally from the south. (The southerly prevailing wind was indicated by defendant's witness, a consultant meteorologist, Seth Kemble. Dr. Willrich, for plaintiffs, used a summary of weather observations from Kansas City Municipal Airport for the years 1951 to 1960, showing the time that wind blew (indicating the quadrant for the jury) from defendant's lands toward the Bowers: January 24.8%; February 28.6%; March 30.8%; April 27.4%; May 27.8%; June 22.1%; July 27.1%; August 27.9%; September 27.1%; October 23.3%; November 16.0%; and December 23.0%. Dr. Willrich also gave the percentages for the same months that the wind blew from the Bowers toward defendant's land.) There was no county zoning when defendant started its operation in January, 1965, and the zoning code later adopted on June 13, 1967 had a nonconforming use provision. Citing Kays v. City of Versailles, 224 Mo.App. 178, 22 S. W.2d 182, defendant correctly says that its business was lawful and not a nuisance per se. It says there was no effect of its hog farm operation on plaintiffs' health and welfare; and reiterating its position that it had complied with Agricultural Engineers' Digest recommendations, claims that plaintiffs overstated the facts regarding odors.

■ In arguing the sufficiency of the evidence defendant fails to set it forth in the light most favorable to plaintiffs, and in accordance with the jury's verdict and the judgment. As to odors, defendant says that its neighbors (who were its witnesses) living to the north, northwest and northeast of its farm had no complaints. Others living to the east and southwest also

had no complaints; its bookkeeper, Joetta Fowler, who had been so employed since 1965, testified that there had been very few days when she smelled obnoxious odors. It says that according to *defendant's* evidence there had never been any overflow from its lagoons, no pumping from the lagoons out onto the ground, and that there was no evidence that it collected surface waters in any fashion and then cast it upon plaintiffs' premises, and there was no evidence of percolation of sewage into underground waters as alleged. By argument 7 of Point I defendant even argues the credibility of witnesses saying that plaintiffs were interested parties in the action, but such a contention is without merit in this court because the jury was the sole judge of the credibility of witnesses and the weight and value of their testimony. Thayer v. Sommer, Mo., 356 S.W. 2d 72; Daniels v. Brown, Mo., 266 S.W.2d 680.

Defendant cites Casanover et al. v. Villanova Realty Co., Mo.App., 209 . S.W.2d 556, for the law regarding surface waters. That case reiterates the "common enemy" doctrine as to discharge of surface waters and the opinion states that there was no contention that defendant collected surface water in any fashion. The case is not in point because what is here present is the collection of hog manure and urine and rotted feed, along with water, in lagoons, then permitting the same to flow onto plaintiffs' properties, together with stench in such a manner and in such quantity as to unreasonably interfere with the enjoyment plaintiffs previously had in their properties.

The evidence of plaintiffs is that since 1965 defendant's lagoons have overflowed and seeped on many occasions and the black manure and liquid ran down into Glenn and Doris Bower's driveway and pond, thence on into Jordan Creek and upon the property of Frank and Minnie Bower. The fish were killed in both of Glenn's ponds. And, with a few exceptions which were conceded by Glenn and

Doris, the odor was continuous and pervaded the entire living premises of both Bowers. The flies and rats increased in number, and social lives of the Bowers and the daughter, Denise, were disrupted by the odors. The neighbors noticed the odors in the area, and saluted Glenn and Doris by holding their noses. The well water of Glenn and Doris acquired an odor, and although boiling of the water was done for only a year, the test showed that it was not fit even for wading. This refutes defendant's contention that there was no percolation of liquid from the lagoon, as the jury could find. The miserable conditions of life of the Bowers as above outlined, the accounts of which are replete in this record, began in 1965 when the first lagoon was filled and continued up to the trial date, March 12, 1969. Thus, plaintiffs have, for about four years, been forced to live next to concentrated filth in defendant's lagoons which has flowed onto their premises, and which has practically continuously given off foul odors during that time.

In the case of Clark v. City of Springfield, Mo.App., 241 S.W.2d 100, 107, the court held that plaintiffs, who from defendants' sanitary and storm sewer had deposits of raw, human excrement and filth with a sickening odor attracting large numbers of flies, and had their well contaminated, made a submissible case for damages for nuisance, all of which "certainly was an interference with the peaceful enjoyment of their premises." In Anno. 50 A.L.R. 1017, 1018, II, it is said, citing Bielman v. Chicago, St. P. & K. C. R. Co., 50 Mo.App. 151, "A piggery, pigpen, or keeping of pigs, is a private nuisance when so located that it violates private rights and produces discomfort, damage, or injury to a few or even only to one person." See also the cited case of Smiths v. McConathy, 11 Mo. 517, where it was held error to instruct to the effect that stenches actually produced disease in plaintiffs or some of their family in a case where large quantities of slops and offal

from the hogpens passed into a creek which ran over plaintiffs' lands, from which noxious and offensive smells and stenches arose which annoyed and disturbed plaintiffs in the possession and enjoyment of their dwelling and farm. Compare also Flanigan v. City of Springfield, Mo., 360 S.W.2d 700; and the temporary nuisance case of Chappell v. City of Springfield, Mo., 388 S.W.2d 886. A comparable situation was presented in Ruppel v. Ralston Purina Company, Mo., 423 S.W.2d 752, and see the later Annotation "Nuisance-Keeping Pigs" 2 A.L.R.3rd 931. Defendant's contention that plaintiffs made no submissible case is ruled against it.

There was no instruction on the subject of private nuisance in MAI at the time this case was tried in March, 1969. Defendant says that Instruction No. 3 did not comply with the rules of MAI in drafting such an instruction. It says that Instruction No. 3 did not include the ultimate issues under the law, saying that those issues and considerations for the jury were set forth in Fuchs v. Curran Carbonizing and Engineering Co., supra, loc.cit. 279 S.W.2d 218.

Instruction No. 3 is as follows:

"Your verdict must be for the plaintiffs, if you believe:

"First, Hog Builders, Inc. was located in close proximity to the property owned and occupied by the plaintiffs; and

"Second, Hog Builders, Inc. caused and permitted obnoxious gasses and odors to escape from their premises, and onto the premises of the Plaintiffs, and

Hog Builders, Inc. deposited large amounts of waste materials in open pools which in turn they caused and permitted to discharge onto surrounding ground and over onto the property of the plaintiffs; and

Hog Builders, Inc. occupied open feed lots with hogs and caused the surface of the feed lots to become contaminated

with waste materials, the surfaces of which were washed over onto the property of the plaintiffs, and

Hog Builders, Inc. designed and built a portion of the hog farm and their open pools of sewage in such a way as to cause the animal waste and sewage to be stored on the downhill side toward the plaintiffs' property so that any discharge would run over onto the property of the plaintiffs, and

"Third, such use by Hog Builders, Inc. of their property and their storage of sewage has substantially impaired the plaintiffs' use of their property, and

"Fourth, such use by the Hog Builders, Inc. and their storage of sewage was unreasonable, and

"Fifth, as a direct result thereof, the plaintiffs were damaged.

"Not in M.A.I. Pl. Prepared."

■ Since the case was tried MAI 22.06 on the subject of private nuisance has been provided. Comparing Instruction No. 3 to the newly approved MAI 22.06, it is seen that it contains the essential ultimate issues of the description of the nuisance and its being in close proximity to plaintiffs' property. All of the acts of defendant are submitted in causing and permitting noxious gases and odors to escape, and waste materials to be discharged onto plaintiffs' properties, substantially impairing their uses of their properties, that defendant's use of its property and the storage of sewage was unreasonable, and the direct result of which was plaintiffs' damage. Instruction No. 3 embodies all the ultimate elements of private nuisance as set forth in the pre-existing Fuchs case, supra; the Clark case, supra; Whipple v. McIntyre, 69 Mo.App. 397; and the Ruppel case, supra; and the further cases cited in the Committee's Comment, page 201 et seq. of MAI. Instruction No. 3 is brief, simple, free of evidentiary detail, and is within the spirit and purpose of MAI. And while defendant is correct that MAI 22.06 cannot be retroac-

tively applied (its effective date was September 1, 1969), its adoption does serve to demonstrate that plaintiffs have followed MAI directions with respect to submitting ultimate issues in instructions where none on the subject appears in MAI. If the ultimate propositions existed at the time MAI 22.06 was adopted they were in existence prior to that time, and it is clear that plaintiffs have selected them so as not to be in the position of misdirection of the jury. Instruction No. 3 is not erroneous for the reasons claimed.

■ Further complaints are that Instruction No. 3 "was a positive misdirection of law regarding defendant's use of its property and no evidence was introduced to subject it to liability." It is argued that the submission that defendant caused the surface of the feed lots to be contaminated with waste washing onto plaintiffs' property was not supported by evidence. Related to the claim is the apparent argument that the instruction ignored defendant's lawful use of its property. It is next said that the instruction was not a proper one under MAI; that there was no evidence to support the term "close proximity"; that plaintiffs, Glenn and Doris Bower and Frank and Minnie Bower, were not similarly situated, that the same injuries were not applicable to them, and that separate instructions should have been used detailing the applicable injuries; that the instruction was prejudicial because defendant was named as Hog Builders, Inc. (more than once for identification); and that the instruction enlarged the area and the property usage of the law of nuisance. The trouble with these additional contentions is that they were not presented to the trial court in the motion for new trial and hence are not preserved for review. They will not be here considered for the first time. Civil Rules 83.13(a), 79.03, V.A.M.R.; Chambers v. Kansas City, Mo., 446 S.W.2d 833, 840 [8, 9].

■ Instruction No. 5 told the jury that if it found for plaintiffs it must award them (as damages) such sum as it believed

would fairly and justly compensate them for any damages it believed they sustained and were reasonably certain to sustain in the future as a direct result of the use Hog Builders, Inc. was making of its property. Although defendant now correctly states that under Stewart et al. v. City of Marshfield, Mo.App., 431 S.W.2d 819, 822 et seq., the measure of damages for permanent nuisance (which was plaintiffs' theory in pleading, proof and submission) is the difference between the values of the property before and after the nuisance was initiated and maintained, defendant in no manner set forth that proposition in its motion for new trial. In the after-trial motion, defendant merely says that Instruction No. 5 is MAI 4.01, and it quotes Civil Rule 70.01, saying that "[P]laintiffs' pleadings and proof and Instruction 5 all relate to both personal injuries and property damage." In no way does the motion assert that Instruction 5 is the wrong measure of damages. The point was not specifically presented to the trial court and was therefore not preserved for review. Civil Rule 70.02, V.A.M.R.; Larson v. Alton and Southern Railroad Company, Mo. App., 431 S.W.2d 687.

Plaintiffs prepared and the court gave Instruction No. 6:

"If you find the issues in favor of the plaintiffs, and if you believe the conduct of defendant as submitted in Instruction No. 3 was willful, wanton or malicious, then in addition to any damages to which you find plaintiffs entitled under Instruction No. 5, you may award plaintiffs an additional amount as punitive damages in such sum as you believe will serve to punish defendant, and to deter it and others from like conduct.

"M.A.I. 10.01
"Plaintiffs Prepared."

Defendant says this instruction is in error for two reasons: "A. Plaintiffs' pleadings fail to raise the issue of punitive damages," and "B. In any event, the evidence will not support the submission of punitive damages for all of plaintiffs' alleged injuries under Paragraph Second of Instruction 3."

■ In both counts for damages plaintiffs pleaded "The acts on the part of the defendant have been careless and negligent and in addition thereto have been intentional, purposeful and unlawful, * * *." At 22 Am.Jur.2d Damages, § 293, p. 388, the subject of pleading exemplary or punitive damages is discussed. It is said: "While it is not always necessary specifically to allege wantonness, malice, or ill will, it must nevertheless appear from the complaint, either by direct averment or from necessary inference, that the act occasioning the damages was done maliciously or was the result of the wilful misconduct of the defendant or of that reckless indifference to the rights of others which is equivalent to an intentional violation of them, at least where the wrongful act does not in itself imply malice." It is there also said that the person demanding exemplary damages must make such averments as will advise the defendant that he will have to meet a demand of that kind at the trial. In O'Brien v. Snodgrass, 123 W.Va. 483, 16 S.E.2d 621, it was held that although exemplary damages need not be pleaded eo nomine, the declaration must allege that the tort pleaded was done maliciously, wantonly, wilfully, or with like animus. The definition of legal malice has long been held not to be actual malice, i. e., that the wrongful act was done in spite or ill will, but that such act or acts be done *intentionally* without just cause or excuse. Beggs v. Universal C. I. T. Credit Corporation, Mo., 409 S.W.2d 719; State ex rel. United Factories v. Hostetter, 344 Mo. 386, 126 S.W.2d 1173. The pleadings here that the wrongful acts complained of were done intentionally and purposefully, coupled with the allegation that such entitled plaintiffs to punitive damages, fairly informed defendant of the nature of the demand. It was not necessary to plead that the acts were done with malice or maliciously since those words are equivalent in definition to

wrongful acts intentionally done without just cause or excuse. Greaves v. Kansas City Junior Orpheum Co. et al., 229 Mo. App. 663, 80 S.W.2d 228, 234, 235 [2–4], and the there cited case of Mooney v. Kennett, 19 Mo. 551, had no words in the pleadings that the arrest and the assault and battery (in Mooney) were done maliciously or equivalently, *intentionally,* and thus are to be distinguished.

■ As to the contention that there was no evidence to submit the issue of punitive damages, the same must be overruled. The evidence reveals that defendant, from the outset, designed and constructed its buildings, pens, holding pool and lagoons in such manner that the offal therefrom would flow downhill toward plaintiffs' properties. From the time the first lagoon overflowed and Glenn Bower complained to defendant, it had notice of the condition and the results thereof. And although defendant says that it constructed its lagoons in accordance with the Agricultural Engineers' Digest yet that very publication in the omitted portion above mentioned cautioned that when a lagoon is full, addition of new wastes will cause overflow of not completely decomposed liquids which may be a health hazard; that all overflow should go into an aerobic lagoon or other waste treatment system for further decomposition; that sludge accumulation will have to be removed when it causes the lagoon to be inefficient. Both of plaintiffs' experts in management and treatment of swine waste testified that anaerobic lagoons are but a temporary treatment or storage device. Something more has to be done as by spreading the manure on the ground, or an aerobic lagoon should be utilized. The evidence here is overwhelming from the plaintiffs and their witnesses that not only was there sludge, manure and waste overflow from the lagoons at the time of their inception, which overflow ran down onto their lands and into Glenn's ponds polluting the same and Jordan Creek

and killing fish in both waters, but at practically all times there were unbearable odors from the hog farm operation. There was an increase in the number of flies and rats in the area. Defendant contends that there was no evidence that its lagoons were overloaded, but from the evidence the jury could find otherwise. Dr. Miner testified that a seriously overloaded anaerobic lagoon has more offensive odors more often; where additional cells for storage capacity are added in a series it means that the initial cell is overloaded which will result in more offensive odors. Dr. Willrich observed that the south lagoon was about four inches from overtopping in March. Glenn Bower and E. R. Ritchey observed pumping by defendant out onto the ground. In the face of all of this evidence of overflow and noxious odors which continued for more than four years, the record is devoid of any proof that defendant took any effective steps to alleviate the conditions. The conclusion which the jury was entitled to draw is that defendant intentionally operated its hog farm and lagoons in such a manner as to substantially interfere with plaintiffs' peaceable enjoyment of their adjoining properties. The giving of Instruction No. 6, permitting the assessment of punitive damages, was supported by the evidence. See Ruppel v. Ralston Purina Company, supra, 423 S.W.2d l.c. 756 [4], 757 [5].

Defendant complains and claims prejudicial error in the court's giving of Instruction No. 9 on forms of verdict. Plaintiffs concede that in drafting this instruction they followed MAI 32.07, "Multiple Plaintiffs (Separate Counts) vs. Defendant," and modified it with respect to the alternatives of punitive damages. Defendant says MAI 32.11 is to be used when the submission is for actual and punitive damages. As given, the forms provided for separate verdicts on actual and punitive damages in this manner:

"If all of you agree upon a verdict in favor of the plaintiffs, Glenn Bower and

Doris Bower on Count II of the petition it may be in the following form:

" 'We, the jury find the issues in favor of the plaintiffs, Glenn Bower and Doris Bower upon Count II of the petition, and assess their actual damages at $＿＿＿ (stating the amount).

Foreman.'

" 'We, the jury find the issues in favor of the plaintiffs, Glenn Bower and Doris Bower upon Count II of the petition and assess punitive damages against the defendant and in favor of Glenn Bower and Doris Bower at $＿＿＿ (stating the amount).

Foreman.'

"If all of you agree upon a verdict in favor of the defendant and against the plaintiffs, Glenn Bower and Doris Bower, on Count II of the petition, it may be in the following form:

" 'We, the jury, find the issues in favor of the defendant and against the plaintiffs on Count II of the petition.

Foreman.'

MAI Supplement"

According to the after-trial testimony of the court reporter, after the trial court stated to counsel that in his circuit the juries had sometimes gotten mixed up in writing their own verdict, it had been the custom to prepare the forms of verdict for the jury and to set them apart from other instructions using a paper clip. The court stated he would not do so in this case unless counsel agreed to such procedure. No objections were made to that procedure. The reporter took the forms of verdict offered by counsel, went into the court reporter's office in Platte County and typed on a separate sheet of paper the various forms of verdict, following the suggestions made in the Form of Verdict instruction. He delivered a copy to the court and to each counsel. The following (converse) forms were tendered to the jury but were not used by it:

" 'We, the jury, find the issues in favor of the defendant and against the plaintiffs on Count II of the petition, as to actual damages.

Foreman.'

" 'We, the jury, find the issues in favor of the defendant and against the plaintiffs on Count II of the petition as to punitive damages.

Foreman.' "

Identical instructions were given as to the claims of plaintiffs, Frank and Minnie Bower, in Count III of the petition.

MAI 32.11 provides these forms of verdict:

"If all of you agree upon a verdict in favor of the plaintiff and you find that plaintiff is entitled to both actual and punitive damages, it may be in the following form:

" 'We, the jury, find the issues in favor of the plaintiff and find that plaintiff is entitled to both actual and punitive damages, and we assess plaintiffs' actual damages in the sum of $＿＿＿, and we further assess plaintiffs' punitive damages in the sum of $＿＿＿.

＿＿＿＿, Foreman.'

"If all of you agree upon a verdict in favor of the plaintiff and you find that plaintiff is entitled to actual damages only, it may be in the following form:

" 'We, the jury, find the issues in favor of the plaintiff and find that plaintiff is entitled to actual damages only, and we assess plaintiffs' actual damages in the sum of $＿＿＿.

＿＿＿＿ Foreman.'

"If all of you agree upon a verdict in favor of the defendant and find that the

plaintiff is entitled to neither actual nor punitive damages, it may be in the following form:

" 'We, the jury, find the issues in favor of the defendant.

_____ Foreman.' "

Defendant says there is no comparison between MAI 32.11 and Instruction No. 9. It says that Instruction No. 9 contains no limitation that it applies only where plaintiffs are entitled to *both* actual and punitive damages nor do the indented paragraphs that follow. It says that the second direction paragraph of MAI 32.11 relates to a verdict for plaintiff where only actual damages are to be assessed, clearly indicating to the jury that it does not have to find both actual and punitive damages. It says that the third direction paragraph relates to a verdict for defendant, clearly pointing out that it is to be used only where the jury finds plaintiff is entitled to neither actual nor punitive damages; and that the second paragraph of Instruction No. 9 fails to point out to the jury that there could have been an assessment of actual damages without punitive damages.

Plaintiffs say that their modification of MAI 32.07 caused Instruction No. 9 to be simple and direct, and to result in a separate verdict on each of the counts; that Instruction No. 5 told the jury it could find actual damages; Instruction No. 6 told the jury it could award an additional amount for punitive damages; and then Instruction No. 9 gave the jury all three possible choices: (1) Actual damages for plaintiffs; (2) punitive damages for plaintiffs; and (3) verdict for the defendant. It is further said by plaintiffs that the modified MAI 32.07 contained a potential for error, i. e., the jury could have found punitive damages, but could have also found for defendant as to actual damages, but that potential did not develop inasmuch as the jury found both actual and punitive damages. In conclusion, plaintiffs say that defendant was not prejudiced by Instruction No. 9 as to forms of verdict.

■ In addition to what plaintiffs contend as to a fair submission of the issues of actual and punitive damages, it should be noted that the additional forms of verdict (now an option of the trial judge, see MAI, Second Edition) above mentioned which were tendered to the jury (but not used), and to which no objection was registered, clearly gave the jury the alternatives of finding no actual or punitive damages, as well as a general verdict on both issues for defendant. Since the jury was clearly informed as to actual and punitive damages by Instructions Nos. 5 and 6, and all alternatives were presented by forms of verdict, plaintiffs have made it perfectly clear that no prejudice resulted to defendant by the use of MAI 32.07 instead of MAI 32.11. The matters of actual and punitive damages were fully argued to the jury. It could not, under all the circumstances and the reading of all the instructions together, have been misdirected or misled into believing that it had to find both actual and punitive damages.

■ Defendant says that error was committed by plaintiffs in failing to mark Instruction No. 9 as to its MAI source (i. e., MAI 32.07). It was said in Gormly v. Johnson, Mo., 451 S.W.2d 45, 47, that the failure to follow directions on use of MAI (70.01(d)) was also presumed to be error, and there and in Buffington v. Fairground Sales Company, Mo.App., 402 S.W.2d 59, 62, it was said that the prejudicial effect of such error was to be judicially determined. In Epps v. Ragsdale, Mo.App., 429 S.W.2d 798, the failure to mark an instruction was overlooked, the case being reversed on other grounds. In Morris v. Klein, Mo.App., 400 S.W.2d 461, 463, the court was forced to speculate as to which MAI the parties were trying to modify. The obvious purpose of Rule 70.01(d) is that the court and all parties will be informed as to which MAI numbered instructions are used. Here there is no speculation about the matter—the plaintiffs concede they were using MAI 32.07 modified, so no prejudicial error resulted in

failing to so mark the source on the given form.

■ Defendant's contention is that MAI 32.02 should have been used in the form of verdict. That MAI refers to stating personal injuries and property damage separately in the verdict. This is not that kind of case. Here the only requirement is that actual damages and punitive damages be separately stated, which was done by the jury in its verdicts returned to the court.

During a pre-trial bench conference defendant disclosed to the court that it was a wholly-owned subsidiary corporation of Nebraska Consolidated Mills of Omaha, Nebraska, and the parent corporation had a division called Nixon Feeds. On voir dire examination, plaintiffs inquired as to financial or other interest of prospective jurors in the three corporations, and defendant concedes that such inquiry was probably within the discretion of the court. Defendant, however, claims prejudicial error to the first paragraph of the question put to the panel as follows:

"Hog Builders, Inc., which I have indicated, is a Missouri Corporation, is wholly owned by the Nebraska Consolidated Mills of Omaha, Nebraska. That Nebraska Corporation also owns the Nixon Feeds which is a distributor of feeds for livestock and does business in this area."

■ Defendant says this prefatory paragraph is the same as advising the jury that other companies are involved which will pay the judgment; that questions are permitted on voir dire examination as to interest in an insurance company, but no cases go so far as to preface the question with the recitation that such insurance company has a policy of insurance protecting the named defendant. No error is present. Certainly the plaintiffs were entitled to inquire as to any interest of prospective jurors in the parent and affiliated companies which obviously had an interest

in the outcome of the case, and certainly the panel was entitled to know, as a basis for disclosing interest, the relationships of the companies. "A stockholder in a corporation which owns stock in another company is disqualified to act as juror in an action against the latter company." 47 Am. Jur.2d Jury, § 325, p. 896. Plaintiffs did not suggest in any way that the parent company would itself pay any judgment.

■ It is contended by defendant that the court erred in permitting Glenn and Doris Bower to testify that defendant pulled the plug of its south lagoon. As to Glenn's answer to a question on cross-examination that the plug was pulled on January 18, 1968, defendant requested a mistrial and proceeded without a ruling on the request. As to Glenn's response, defendant preserved nothing thereon in its motion for new trial, and the same cannot now be considered. As to Doris' response on the same subject, defendant did not request a mistrial, but objected thereto and requested that the answer be stricken. No error appears because that request was granted by the court in these words: "Unless there is some showing that this witness knows about that, it will be stricken." Thereafter Doris testified that she had not been up to the lagoon that night.

■ Joetta Fowler was defendant's bookkeeper. Defendant claims error in the court's permitting plaintiffs to question her concerning intercompany accounts, thus prejudicially putting the parent company, Nebraska Consolidated Mills, before the jury. The line of questioning had to do with defendant's worth, and the specific question asked about an item "general expense, central office administration," for 1966 fiscal year $39,280.54; 1967, $72,103.-48; and 1968, $70,783.72, which was charged to defendant and paid to Nebraska Consolidated Mills' office in Omaha, Nebraska. The inquiry related to defendant's true financial condition, and was thus not improper.

■ Error is claimed in the trial court's ruling that the income tax returns of Glenn Bower could not be inquired into. Glenn claimed no loss of income as a result of the hog farm operation. The measure of his damages was the depreciation in the value of his farm as a result of permanent nuisance. No credibility issue was presented. The matter was collateral, and no error is shown by reason of the court's ruling.

■ A large aerial photograph of the hog farm, Plaintiffs' Exhibit 1, was admitted into evidence. Defendant says the exhibit is a gross distortion and does not truly and accurately represent the area involved, contrasting it to one of defendant's own photographs of the area from the Bowers' front yard. Suffice it to say that Plaintiffs' Exhibit 1 was explained by witness Glenn Bower as to what it showed. If the view to the north from the level of the road in front of the Bowers' property was different than Exhibit 1, such was shown by other photographs, and since the jury was permitted to view the area it would know of any discrepancy existing. No error appears by reason of the admission into evidence of this photograph.

■ Complaint is made of plaintiffs' reference in closing argument to Nebraska Consolidated Mills and Nixon Feeds. The references are these: "I am somewhat surprised that with all of these prevailing winds and all of this odor that is in evidence that these Omaha owners, the people that are reaping the profit out of this operation here in Missouri, at some time during the year can't smell that stink and come down here and do something about it, but, to date they haven't. * * * Now if Hog Builders, Inc. and the boys in Omaha can't figure out what to do with eighty tons of sewage a day, how in the world can Frank Bower, at age 79, figure out what to do with it. * * * Here is another reason that I think we had better take a strong look at Hog Builders, Inc. and the boys in Omaha who didn't show up here at any time this week because they weren't concerned with this, they think they've got us, but we will see if they do. The only way the boys in Omaha are going to hear us is to be punished, and we ask that you do that. * * * From their tax returns they knew that the punitive damage issue was coming up so look what they have done here. Back in June of 1965 they didn't have any profit and they didn't have any central office expense. Remember the central office expense was the money they shipped to Omaha, it is not for insurance. * * * Central office expense is money shipped to Omaha to the central office. * * * What does the central office do for them—they control them. * * * Why didn't they go out before they ever started this and look at their problem and get the size of it and find a solution to it and then go about it in the right way. Do you know why they didn't do that—the profit motive, that's the reason they didn't do that. * * * They didn't intend to do it in the right way. They intended to go out here and to camp just as long as they could and to take just as much out of the people and the earth as they could and ship it to Omaha." It is to be remembered that Hog Builders, Inc. is a wholly-owned corporation of the Omaha Company. The argument above alluded to, while vehement, is referable to the control which could have been exercised by persons not appearing at trial, and to the profitable operation of defendant. The matter of central office expense on the tax return was not explained by defendant, and if excluded the result would have been a profitable operation, the inferences of which being subject to legitimate argument. It was not suggested that anyone other than defendant would be responsible for the judgment, which was the situation in Murphy v. Graves, Mo., 294 S.W.2d 29.

■ Plaintiffs used a blackboard (a photograph of which appears in the transcript) to argue damages. Defendant claims error in the use of the blackboard. The figures used on the blackboard came

from defendant's tax returns, and plaintiffs' argument is that the item "central office expense" represented nothing more than a draining of profits from defendant amounting to a concealment of the real income of the company. In Bone v. General Motors Corporation, Mo., 322 S.W.2d 916, 924 [8–11], no reversible error was found in the use of a blackboard in argument to illustrate damages, which case cited Boese v. Love, Mo., 300 S.W.2d 453 which held that charts, etc., which were not in evidence might be used to illustrate a point in argument *based on the evidence* if not so used as to be confusing or misleading. See also 88 C.J.S. Trial § 177, p. 348.

 Defendant asked its witness, Melvin Bradley, a State Extension Specialist, about the social and economic value of large-scale operations such as defendant's. An objection was made by plaintiffs on the ground that such did not develop any facts in issue in the case, which objection was overruled. Defendant complains of the trial court's remarks at the time to the effect that the questions had nothing to do with the issues, which were whether plaintiffs had sustained damages. It does not appear whether or not the court's remarks were made before the jury, but defendant made no point of the same in the motion for new trial. In its reply brief, defendant urges the matter be considered as plain error, citing Baker v. Fortney, Mo.App., 299 S.W.2d 563. In that case there was a positive misdirection of the jury as to damages recoverable. No direction to the jury here appears, and there is no error, much less plain error, affecting substantial rights present.

Defendant's last point is: "The verdict is against the weight of the evidence and is so excessive, both for actual and punitive damages, that it had to result from bias and prejudice of the jury."

In presenting this point, defendant relies upon the discrepancy in the evidence of values of the witnesses. Glenn Bower testified that the value of his 58 acres, with an 11-year-old house, barn, hay shed, shop and 2 ponds was $72,000 on December 1, 1964, and its value at the time of trial was $20,000, a difference of $52,000. His opinion as to the value of his father's 58-acre farm, with a 37-year-old house, shed, garage, small buildings, chicken house and hog house was $57,000 on December 31, 1964, and its present value was $16,000, a difference of $41,000. Plaintiffs' realtor witness, Fred Eder, gave the value of Glenn Bower's farm as $72,500 on December 31, 1964, and its present value at $25,000, a damage of $47,500. Frank and Minnie Bower's farm was valued at $54,000 before and $20,000 after, or $34,000 damage. Defendant's witness valued both sets of plaintiffs' property at $200 per acre, with no damage to the Frank Bower property, and a $3,200 damage to the Glenn Bower property. Defendant says the "difference is so great that something is wrong," and that from the photographic exhibits it can be seen that plaintiffs have exaggerated the values of their properties. As noted, the jury awarded Glenn and Doris Bower $34,200 actual damages to their 58-acre property, and $60,000 punitive damages; and to Frank and Minnie Bower (for their older property) $12,000 actual and $30,000 punitive damages, thus not accepting plaintiffs' claims as to such damages.

What is important in this case is that on defendant's request (and over plaintiffs' objections) the jury, accompanied by the trial judge and the court reporter, went out and viewed the properties and the whole situation, including defendant's hog farm operation. In Chicago, R. I. & P. Ry. Co. v. Hosman et al., 227 Mo.App. 659, 57 S. W.2d 434, 437 [7–9], it was said, "During the trial of the cause the jury, by agreement of the parties, viewed the premises. We shall assume that each of the jurors was a resident of Grundy county, sober and intelligent, of good reputation, over 21 years of age, and otherwise qualified. (Citing statute.) Each viewed the premises, had actual knowledge of the situation, and each was able to form his own judg-

ment. * * * It is fair to presume that the jury, having received correct instruction from the court, arrived at the amount of the damages from its own observation. The purpose of the parties in causing the jury to view the premises was to enable it to form its own estimate of the amount of damages." In City of Springfield v. Ellis, Mo.App., 97 S.W.2d 154, 159 [7], the court said, "It must be borne in mind that the jury viewed the property, and from viewing this property formed some conclusion as to the benefits and damages. * * * [Y]et since both parties agreed, any conclusion that the jury reached as a result of viewing the property would be binding on the parties, * * * and [we] must presume that they did reach some conclusion as to the damages and benefits from having seen the property." See also Proceedings for Condemnation of Private Property for Sixth Street Expressway v. National Engineering & Mfg. Co., Mo.App., 274 S.W.2d 490; and Kansas City v. O'Donnell, Mo.App., 296 S.W.2d 914, and, in contrast, in City of St. Louis v. Worthington, Mo., 19 S.W.2d 1066, it was said that the jury, not viewing the property, cannot be said to have acted on its own knowledge, but was presumed to have acted on the testimony of value.

The mere difference or disparity in the testimony of values of plaintiffs and their witness and that of defendant's witness (and what the jury actually found) is no basis, standing alone, to disturb the verdicts. State ex rel. State Highway Commission v. Koberna, Mo., 396 S.W.2d 654, 668 [28–30].

Defendant argues that the verdicts for punitive damages were so excessive that unquestionably the jury was biased and prejudiced, and "Where bias and prejudice exist the case must be retried and judgments are not subject to remittitur." Thus, no question of mere excessiveness is presented on this appeal. In Seested v. Post Printing & Publishing Co., 326 Mo. 559, 31 S.W.2d 1045, 1054 [17, 18], it was said, "The award of punitive damages stands on a different footing [than actual damages]: 'The giving of actual damages is not a matter of discretion, but one of absolute right, and such damages are required to be measured by standards that make them, as far as it is humanly possible, an exact equivalent in money of the injury suffered, while on the other hand, the giving or withholding of punitive damages, as well as the amount thereof, lies wholly within the discretion of the jury.' Grier v. [Kansas City, C.C. & St. J.] Railway Co., 286 Mo. 523, 542, 228 S.W. 454, 460. Unless therefore it plainly appears that there has been an abuse of such discretion, a court is not justified in interfering with an assessment of punitive damages." In Beggs v. Universal C.I.T. Credit Corporation, Mo., 409 S.W.2d 719, 724 [8–13], the court said, "Ordinarily abuse of discretion in this reference means so out of all proper proportion to the factors involved as to reveal improper motives or a clear absence of the honest exercise of judgment." In the context of defendant's argument an abuse of discretion in the awards of punitive damages would have to be inferred from the size of the verdict alone. Defendant suggests the verdicts were brought about by prejudicial errors in voir dire examination, admission of evidence and argument, but these matters in the foregoing points presented have all been ruled as not being error. It has long been the rule that the amount of the verdict, standing alone, will not authorize appellate court reversal of a judgment on the basis of passion and prejudice. Jones v. Pennsylvania R. Co., 353 Mo. 163, 182 S.W.2d 157; Mitchell v. Pla-Mor, Inc., Mo., 237 S.W.2d 189; Reynolds v. Arnold, Mo., 443 S.W.2d 793. Something more in the record than the size of the verdict must appear, and here it is not present. Rather, from all of the evidence, the jury could and must have found that defendant's acts for more than four years' duration substantially destroyed the home lives of the plaintiffs and damaged their properties, and therefore it proportioned the punitive damages to the degree of malice and

contumely characterizing the acts. Chappell v. City of Springfield, Mo., 423 S.W. 2d 810, 814; State ex rel. St. Joseph Belt Ry. Co. v. Shain, 341 Mo. 733, 108 S.W.2d 351, 356. Nothing in this case indicates the jury was actuated by improper motives or that there was "a clear absence of the honest exercise of judgment," or that the verdicts resulted from any misconduct engendered during the course of the trial. Bias and prejudice are not demonstrated. Rather, the verdicts of punitive damages (although quite liberal) appear to be referable to all the facts and circumstances in evidence in the case, including the inspection the jury itself made of the properties.

The judgments are affirmed.

BARRETT, C., concurs.

STOCKARD, C., not sitting.

PER CURIAM.

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.